Stuart L. Baltimore and Glennis M. Baltimore v. Commissioner.
Baltimore v. Commissioner
Docket No. 62629.
United States Tax Court
T.C. Memo 1958-78; 1958 Tax Ct. Memo LEXIS 150; 17 T.C.M. (CCH) 388; T.C.M. (RIA) 58078; April 30, 1958
*150 In early 1949, petitioner was employed in the butter and egg business at a total remuneration of $175 per week. Three persons wishing to commence such a business persuaded him to leave his employment to manage the new enterprise. It was agreed that petitioner would operate the business but make no capital investment, and would receive a salary of $125 per week, plus an equal share in the enterprise. A corporation was formed, and each of the other three persons invested $10,000. Soon thereafter, a need for additional capital became apparent, and a fourth individual invested $10,000. Petitioner and the four investors each received stock having a value of $8,000, and constituting one-fifth of the total stock issued. Held, the value of the interest received in the business constituted taxable income to petitioner, and was not a gift within the purview of section 22(b)(3), I.R.C. of 1939. John D. Gilmore, Jr., Esq., and Victor A. DeLeon, Esq., 1520 K Street, N.W., Washington, D.C., for the petitioners. Joseph N. Ingolia, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the amount *151 of $1,744.86 in the income tax of petitioners for the taxable year 1949. The sole issue is whether respondent erred in determining that certain shares of stock or funds used to purchase such shares were received by one of the petitioners as taxable income, rather than as a gift excludible from income pursuant to section 22(b)(3) of the Internal Revenue Code of 1939. Findings of Fact No written stipulation of facts has been filed. Certain oral stipulations made by counsel at the hearing are incorporated by this reference as a part of our findings. Petitioners are husband and wife, residing in Silver Spring, Maryland. During 1949 they resided in Washington, D.C. They filed their joint income tax return for the calendar year 1949 on the cash basis with the then collector of internal revenue for the district of Maryland. The instant controversy arises from a transaction of petitioner Stuart L. Baltimore, and he will hereinafter be referred to as the petitioner. During the early part of 1949 petitioner was vice president of National City Dairy Co., and was in charge of the egg room. His remuneration consisted of a salary of $150 per week plus a car allowance, or a total of approximately *152 $175 per week. Three individuals named respectively Clark, Smith and Ward decided about this time to form a new business of the type in which petitioner had considerable experience. They needed someone to operate the enterprise, and approached petitioner. A series of more or less informal conferences followed. One Weston, who had previously performed accounting and auditing services for Smith, usually attended these meetings. It was decided to form a corporation, with Clark, Smith and Ward each contributing $10,000. Petitioner would make no contribution of capital, but was to manage the enterprise and receive a salary of $125 per week, plus an equal share in the business. Weston was engaged as accountant for the enterprise. He caused the formation of a Delaware corporation under the name of Supreme Butter and Egg Co., Inc. (hereinafter called Supreme), and set up and kept its books and records. Supreme commenced business on or about May 9, 1949, with petitioner as manager at a salary of $125 per week. Clark, Smith and Ward each contributed $10,000 within the first few months following the commencement of operations. At least two of them, Smith and Ward, borrowed such funds. *153 Soon thereafter, the need for more capital became apparent. Weston was given the opportunity to and did invest $10,000 on the same terms as the other investors, i.e., petitioner and each of them to receive an equal share in the enterprise. Each of the five individuals received 200 shares of stock in Supreme, having a value of $8,000. [1] When all of them had finally received their shares, all of the required capital contributions had been paid in, with the exception of $2,000 due from Weston, which he thereafter disbursed to or for the benefit of Supreme. Soon after operations commenced, petitioner was requested to sign an employment agreement for a fixed term. He refused to do so, and was at no time committed to remain with Supreme *154 for any fixed or determinable period. Petitioner received the $8,000 gain in question as consideration for terminating his previous employment and accepting a position as manager of Supreme. Opinion The sole issue before us is whether $8,000 in cash or stock received by petitioner in 1949 was taxable as income, as determined by respondent, or was a gift within the meaning of section 22(b)(3) of the Internal Revenue Code of 1939, as contended by petitioner. Having reviewed the record, we have no alternative but to hold that income was received. An excludible gift within the intendment of the statute requires a donative intent, normally raising a question of fact. Cf. Canton v. United States, 226 Fed. (2d) 313, 317, 318 (C.A. 8), certiorari denied 350 U.S. 965; Smith v. Manning, 189 Fed. (2d) 345, 348 (C.A. 3); Chauncey L. Landon, 16 B.T.A. 907, 908; Willis L. Garey, 16 B.T.A. 274, 276. The presence of consideration, however, is inconsistent with such intent and is fatal to the applicability of that provision. Cf. Commissioner v. Montague, 126 Fed. (2d) 948, 951 (C.A. 6); Noel v. Parrott, 15 Fed. (2d) 669 *155 (C.A. 4), certiorari denied 273 U.S. 754; Banner Building Co., 46 B.T.A. 857, 864; C. B. Wilcox, 27 B.T.A. 580, 583; J. T. Lupton, 19 B.T.A. 166, 168; Chauncey L. Landon, supra; Willis L. Garey, supra; Cora B. Beatty, Executrix, 7 B.T.A. 726, 728; Estate of David R. Daly, 3 B.T.A. 1042, 1044. See also Commissioner v. LoBue, 351 U.S. 243, 246; Old Colony Tr. Co. v. Commissioner, 279 U.S. 716; John H. Parrott, 1 B.T.A. 1. In Banner Building Co., supra, this Court (then the Board of Tax Appeals) said at page 864: "Gifts are defined as the voluntary transfer of property from one person to another, without any consideration, or compensation therefor." Petitioner left a position paying him a total remuneration of $175 per week, to operate Supreme at a salary of $125 per week. He also received, as part of the same transaction, an equal share in the enterprise. He does not deny that his salary is income, and we do not understand how the receipt of a share in the business stands on a different footing. One item, as much as the other, *156 was received by petitioner in return for leaving his previous employment and operating Supreme. Petitioner makes much of the fact that he at no time bound himself to remain with Supreme for any specific length of time. We do not deem this controlling. In failing to exact from petitioner any such agreement before investing substantial funds in the venture, the investors may have failed to exercise sound business judgment. That, however, cannot change the fact that petitioner furnished consideration for everything he received when he left his old employment to manage Supreme and began the new work. We are not here concerned with the relative values of what he gave and what he received. Cf. Kathryn Lammerding, 40 B.T.A. 589, affd. 121 Fed. (2d) 80 (C.A.D.C.). It is sufficient for the purposes of this proceeding that there was in fact and law a quid pro quo, and therefore no gift. Nor do we find any significance in the fact that there was no employer-employee relationship between the four contributors on the one hand, and petitioner on the other. Such relationship is unnecessary to the validity of respondent's determination. Petitioner received an interest *157 in Supreme, or cash used to purchase such interest, in return for doing something desired by the investors. The value of what he received for his act constituted income to him, regardless of the presence or absence of any given relationship between the parties. Cf. Batterman v. Commissioner, 142 Fed. (2d) 448 (C.A. 6), affirming a Memorandum Opinion of this Court entered February 25, 1943 [1 TCM 667], certiorari denied 322 U.S. 756. The transaction in question was so clearly an arm's length business dealing devoid of any element of gift, that such fact even shows through testimony by petitioner and his witness, no matter how carefully they tried to produce the contrary appearance. Thus, in describing the early negotiations, petitioner testified in part as follows: "Q Now, sir, directing your attention to the early part of 1949, were you approached at any time by an 'R. F. Ward' wish respect to the formation of another company? "A Yes, sir. "Q And could - would you tell the court, sir, what occurred at that time? "A Well, he approached me and asked me if I would like to form a poultry and egg company, and that he would put up the money. *158 A few days later Mr. Clark and Mr. Ward and I had lunch together, and they agreed that they would put up the money to operate this business, and we would be on a one-third equal basis and they would give me an equal share in the company. "A few days later, we had lunch again and Mr. Smith came into it, so then Mr. Smith got Mr. Weston in as his auditor, and made all the necessary arrangements and formed this corporation. "Q What did you agree to do? "A I agreed to operate the place, manage it, and with my credit that I could get on eggs, poultry, and so forth, to just generally take care of the place and operate it, buy and sell." Not long after the enterprise got under way, disagreements arose between some of the parties interested therein, for reasons not fully disclosed by the record, nor material to this proceeding. Litigation commenced, in which petitioner testified. This earlier testimony was the subject of several questions asked of petitioner by Government counsel at the instant proceeding. The present testimony on this point reads as follows: "Q Mr. Baltimore, on or about January 6, 1955, did you give testimony in the civil action before the auditor of the District *159 Court, Mr. Eden? "A I don't remember the date, but I gave testimony before Mr. Eden. "Q And were you asked what your duties were with respect to Supreme Butter and Egg? "A I don't remember about that, but probably was. "Q Were you asked why you went to Supreme Butter and Egg and what you were to receive? "A Well, if I answered it, I answered the same as I answered it here, that I was supposed to receive $125 a week and one-fifth interest in the business. "Q And you were supposed to receive this $125 a week and one-fifth interest for your services as compensation for your services? "A I was supposed to receive $125 for services. "Q I show you now, Mr. Baltimore, a copy of that testimony that you gave and ask you to read your answer to the question, 'And what were you to receive for services?' "A That is right, I was supposed to get an equal share. "Q Will you please read the answer, sir? "A 'At the inception of it, I think it was $125 a week and an equal share, $2,000 from each stockholder.'" Weston testified on behalf of petitioner and insisted that he had intended a gift or gratuity to petitioner in the amount of $2,000, despite having first met petitioner *160 only a few months earlier. No explanation was given for this extraordinary generosity, except one which shows that no gift was ever intended. Weston testified in this respect as follows: "THE WITNESS: All right. I was willing to give up $2,000 of my money for a man that would devote his time and operate the business. He did do that, and he made a success of it. I don't think there is any question of that. Our gamble was correct, from the beginning right through until we got into this court action. We had assets representing about $60 or $70 thousand at the time a receiver was appointed." By this testimony Weston contradicted his own theory. In addition, he was contradicted in this respect by Ward; and moreover, the fact that Ward and Smith had to borrow the funds they contributed to Supreme further weakens petitioner's theory. Petitioner's reliance on Helvering v. Amer. Dental Co., 318 U.S. 322, is unsound. That case involved the partial cancellation of indebtedness, which the Supreme Court viewed as akin to the reduction of purchase price after a sale, and unlike the instant case, the taxpayer there was not required to do anything on its part in order to obtain *161 the benefit in controversy. It is true, as that case held and petitioner states on brief, that the motives underlying a gratuitous transfer are irrelevant. But there must be an intent to make such transfer, and such intent was not present here. Finally, petitioner argues on brief that proof that he furnished no consideration for his shares in Supreme lies in the fact that the one-fourth interest he was originally supposed to receive "was decreased" to a one-fifth interest when Weston joined "without consultation" with petitioner. There are a multitude of fallacies in this argument. The "decrease" of which petitioner speaks was actually an increase in the value of petitioner's interest from $7,500 (one-fourth of $30,000) to $8,000 (one-fifth of $40,000). The only reduction was in voting power, and the record does not show that petitioner had any concern over this aspect of his position as a stockholder. There is no indication whatever that he valued his voting position enough to view this change as a reduction in his interest despite a gain in market value in the amount of $500. There is no evidence that petitioner ever objected to Weston's entry, so we need not determine, even *162 if it would be relevant, the legal validity of such objection. And finally, the record does not demonstrate whether or not petitioner was consulted with respect to this matter. His bold assertion on brief that he was not cannot establish that as a fact. [2]
Petitioner has failed *163 to show that any part of the $8,000 in cash or stock received by him was a gift within the meaning of section 22(b)(3) of the Internal Revenue Code of 1939. Respondent's determination must accordingly be sustained. Decision will be entered for the respondent. Footnotes
1. It is uncertain from the record whether Weston received his shares in the late summer or early fall of 1949, when the other shareholders received their shares, or whether he received them in early 1950. It is also unclear when, precisely, he was first asked to join in the venture. We do not regard these matters as material to the ultimate resolution of the issue before us and have accordingly made no detailed findings with respect thereto.↩
2. Petitioner's testimony, in fact, affirmatively shows that he was present when Weston was formally asked to invest, and was aware that such request was made. He did not claim that he tried to block that action, and it would seem that he, being one of the parties present at the meeting, must have participated in the decision. He testified as follows: A. We had another meeting at the Woodward Building. Q. Who had this meeting, sir? A. Mr. Weston. Q. Who was present? A. Mr. Clark, Mr. Ward, Mr. Weston, myself and Mr. Smith. We didn't have enough money to operate with, even with the capital. In fact, I went to National City Dairy and borrowed $20,000, and put in Supreme myself. They asked Mr. Weston to come into the business, so Mr. Weston then came into the business as a one-fifth shareholder of Supreme Butter and Egg Company. I had one-fifth, Mr. Weston, Mr. Clark, Mr. Ward, and Mr. Smith.↩